LEGAL SERVICES OF NORTHERN CALIFORNIA
CORY TURNER, SBN # 285235
E-mail: cturner@lsnc.net
541 Normal Avenue
Chico, CA 95928
Telephone: (530) 345-9491
Fax: (530) 345-6913

SARAH J. STEINHEIMER, SBN # 267552
E-mail: ssteinheimer@lsnc.net
STEPHEN E. GOLDBERG, SBN # 173499
E-mail: sgoldberg@lsnc.net
517 12th Street
Sacramento, CA 95928
Telephone: (916) 551-2150
Fax: (916) 551-2195

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| **BOBBY WARREN; ANDY LAMBACH; JONATHON WILLIAMS; MICHAEL SAMUELSON; TRACY MILLER; TONA PETERSEN; CAROL BETH THOMPSON; CHRISTA STEVENS**, <br><br> Plaintiffs, <br><br> v. <br><br> **CITY OF CHICO; CITY OF CHICO POLICE DEPARTMENT**, <br><br> Defendants. | Case No. 2:21-cv-00640-KJM-DMC <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF PURSUANT TO 42 U.S.C. § 1983** |

1

1

2

## **PRELIMINARY STATEMENT**

3        1.      Acknowledging an unprecedented shortage of emergency shelter and affordable

4   housing, the City of Chico, located in Butte County declared a shelter crisis in October 2018. Just

5   one month later, the Camp Fire destroyed nearly 14,000 single-family and multifamily homes in

6   the county, leaving tens of thousands of people in the county homeless. Less than two years later,

7   in 2020, another wildfire destroyed hundreds of homes. In 2018, when the City of Chico declared

8   a shelter emergency, there were nearly 1,000 homeless residents in the entire county, hundreds of

9   whom were unhoused. Today, more than two years after the Camp Fire, the Housing Authority of

10  the County of Butte estimates that there are more than six thousand households in Chico and its

11  neighboring town, Oroville that lack permanent housing and are sleeping in tents, cars, and camp

12  trailers.

13       2.      In 2020, the available shelter beds in the region decreased due to the COVID-19

14  pandemic. The only congregate shelter in Chico reduced its capacity to reduce the spread of the

15  virus. The city's temporary winter shelter did not open for most of the winter. At the same time,

16  there is a zero percent rental housing vacancy rate and rents have increased to unaffordable levels

17  for Chico's lowest income residents.

18       3.      In December 2020, fully aware of the housing crisis and hundreds, if not thousands

19  of unhoused community members without access to indoor shelter, the Chico City Council

20  adopted an ordinance criminalizing camping and remaining after-hours in city parks and open

21  spaces. The ordinance increased penalties for these acts from administrative citations to criminal

22  penalties, which permitted the City to arrest and charge unhoused community members with

23  misdemeanors for resting or sleeping in areas of the city where they were least likely to obstruct

24  traffic, disturb commercial activity or increase risk of community spread of COVID-19.

25       4.      In January 2021, the City and Police Department began aggressive enforcement of

26  the new ordinance and an older citywide ordinance that bans camping on any public property

27  within city limits. Law enforcement has methodically, location by location, forced unhoused

28  residents to leave their resting and sleeping places by threatening criminal citation, arrest, and

1    seizure of the residents' property.

2        5.    These two anti-camping ordinances are part of a larger scheme of local laws that

3    impose criminal penalties for homeless people when they sleep, sit, lie down, and rest in public.

4    The city continued enforcing this web of ordinances, even following the devastating wildfire

5    disasters and pausing only briefly during the current COVID-19 pandemic. According to public

6    documents, the city made 120 arrests for violations of the citywide anti-camping ordinance

7    between 2018 and 2020. Through its recent increased enforcement that started on January 7,

8    2021, the city has enforced its anti-camping ordinances by threatening more than 100 unsheltered

9    people with arrest at various locations throughout the city.

10        6.    Defendants actions against involuntarily homeless individuals violate their right to

11    be free from cruel and unusual punishment and excessive fees, and to due process of the law

12    under the Eight and Fourteenth Amendments of the United States Constitution. Defendants

13    persistent and aggressive enforcement initiative is taking place as the global COVID-19 pandemic

14    continues to pose immediate danger to the health and safety all people who are unsheltered, and

15    to the entire community, in violation of the Fourteenth Amendment.

16        7.    Plaintiffs are all involuntarily unhoused residents of Chico. They are at immediate

17    risk of being cited, arrested and prosecuted for sleeping, sitting, lying, resting and simply existing

18    in the City of Chico. Plaintiffs seek prospective injunctive and declaratory relief pursuant to 42

19    U.S.C. section 1983.

20                    **JURISDICTION AND VENUE**

21        8.    This is a civil rights action arising under 42 U.S.C. § 1983 based upon the

22    violations of Plaintiffs' rights under the Fourth, Eighth, and Fourteenth Amendments to the

23    United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. sections 1331 (federal

24    question jurisdiction) and 1343 (civil rights jurisdiction). Jurisdiction also exists under the

25    Declaratory Judgment Act, 28 U.S.C. §§2201(a) and 2202.

26        9.    This Court has supplemental jurisdiction over the related state law claims pursuant

27    to 28 U.S.C. section 1367(a) because those claims form part of the same case or controversy

28    under Article III of the United States Constitution. Plaintiffs' state law claims share all common

operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

10.     Venue is proper in the Sacramento Division of the Eastern District in that the events and conduct complained of herein all occurred in the City of Chico, located in Butte County.

### **PARTIES**

11.     Plaintiff Bobby Warren is and was at all relevant times an involuntarily unhoused resident of Chico, California.

12.     Plaintiff Andy Lambach is and was at all relevant times an involuntarily unhoused resident of Chico, California.

13.     Plaintiff Jonathon Williams is and was at all relevant times an involuntarily unhoused resident of Chico, California.

14.     Plaintiff Michael Samuelson is and was at all relevant times an involuntarily unhoused resident of Chico, California.

15.     Plaintiff Tracy Miller is and was at all relevant times an involuntarily unhoused resident of Chico, California.

16.     Plaintiff Tona Petersen is and was at all relevant times an involuntarily unhoused resident of Chico, California.

17.     Plaintiff Carol Beth Thompson is and was at all relevant times an involuntarily unhoused resident of Chico, California.

18.     Plaintiff Christa Stevens is and was at all relevant times an involuntarily unhoused resident of Chico, California.

19.     Defendant City of Chico is a government entity with the capacity to sue and be sued. Employees of the City of Chico have engaged in the acts complained of herein pursuant to the official policies, practices and customs of the City of Chico that are consented to and authorized by policymakers of the City of Chico. The acts complained of were intentionally committed, are ongoing, and will continued unless restrained by the Court.

20.     Defendant City of Chico Police Department is a department of the City of Chico. The Police Department employees enforce the actions, policies, procedures, practices, and customs of both the City of Chico and City of Chico Police Department policy makers.

### FACTS

### CHICO'S LACK OF ADEQUATE SHELTER

21.     The City of Chico has had an affordable housing crisis that has persisted for several years. On October 2, 2018, the city declared a shelter crisis based on a finding that a significant number of persons located within the City are unable to find shelter.

22.     The 2019 Point-in-Time Survey of people who are homeless in Butte County reaffirmed the continuation of this crisis. The 2019 Point-in-Time Survey, which is the most recent survey completed, found that there were 891 unsheltered, 420 sheltered, and 993 people sheltered with Federal Emergency Management Agency (FEMA) support in Butte County. About 43.66 percent of those unsheltered in Butte County live in the City of Chico.

23.     According to the 2019 Point-In-Time Survey, in Chico alone, there are 571 unsheltered individuals and 293 sheltered individuals, meaning 66 percent of Chico's homeless population is unsheltered. The report estimated that the actual number is higher, "due to ongoing challenges in locating homeless individuals, especially those who are displaced and unhoused due to the Camp Fire."

24.     The number of unhoused individuals and families in Butte County increased dramatically after the 2018 Camp Fire and the 2020 North Complex Fires. The Housing Authority of the County of Butte estimates that today as many as six to seven thousand households in Chico, and its neighboring town, Oroville are unhoused and living in tents or trailers. The Housing Authority also estimates that within these unhoused households there are 500 school-aged children.

25.     The 2019 Point-in-Time Survey found that 31 percent of all people experiencing homelessness in Chico reported losing homes in the Camp Fire. Eighty percent of Camp Fire survivors experiencing homelessness in Chico are unsheltered – 38 percent of whom report sleeping with a friend or family in their house or apartment, 30 percent on the street or sidewalk,

14 percent in the park, 8 percent in an outdoor encampment, 5 percent under a bridge/overpass, and 5 percent "other."

26.    About 69 percent of people experiencing homelessness in Chico reported in the 2019 Point-in-Time Survey that they are homeless for financial reasons.

27.    On February 2, 2021, a staff report directed to the Chico City Council stated, "There is insufficient capacity to shelter everyone experiencing homelessness in Chico."

28.    There are only two emergency shelter providers in Chico. These two shelters do not have sufficient combined capacity for all people who are unsheltered in Chico, and only have a combined maximum capacity of 130 – 135 beds due to COVID-19 virus transmission safety protocols.

29.    One of the two shelters is the Torres Community Shelter, a year-round congregate emergency shelter that is available to unsheltered men and women. It also operates a shelter in another location for families with children. Due to the COVID-19 pandemic, the Torres Shelter currently has a reduced capacity of 120 beds.

30.    Guests of the Torres Shelter sleep in a communal setting and are provided meals. The shelter has limited ability to provide accommodations for guests with disabilities or medical conditions who require a special diet, private space or service animals. For the most part, the shelter cannot accommodate pets.

31.    The second shelter, Safe Space Winter Shelter, is a temporary winter shelter. However, it did not open in 2020 due to the COVID-19 pandemic. In February 2021, the shelter opened a medical referral-only shelter in rotating locations with 10 to 15 beds for unsheltered individuals, including those discharged from Enloe Hospital or Oroville Hospital or referred by Project Roomkey. The Safe Space Winter Shelter will end in mid-April 2021. The shelter is currently full and has a waitlist. It is not generally available to people who are unsheltered.

32.    Project Roomkey provides hotel rooms to unhoused people who are vulnerable to complications from COVID-19, in accordance with Center for Disease Control (CDC) Guidelines to provide non-congregate sheltering wherever possible and with state and local shelter-in-place rules and recommendations. While there remain approximately 79 people in the program, Project

Roomkey is no longer available as an emergency shelter. It is only for people who are currently unsheltered if they have been exposed to or contracted COVID-19.

33.    The City of Chico now has fewer shelter beds than it did in 2018 when it declared a shelter crisis, despite having more people who are unsheltered.

34.    When Chico declared a shelter crisis, the rental housing vacancy rate was less than 2 percent. One month later, following the Camp Fire, the vacancy rate dropped to nearly zero as Chico absorbed more than 18,000 new residents between 2018 and 2020, a 20 percent population increase. During the same period, however, the city added fewer than 3,900 new housing units, an increase of only 1.4 percent.

35.    The HUD Fair Market Rent for a one-bedroom unit in Chico increased from $785 in 2018 to $894 in 2019 and has remained around $900. Actual median rents are higher.

36.    Nearly one quarter (23.2 percent) of Chico residents live in poverty. This is more than double the poverty rate of the California, which is 11.8 percent. Butte County also has a high poverty rate of 16.1 percent.

37.    Inexplicably, the city rescinded its shelter crisis declaration on April 6, 2021, despite having more people who are unhoused and fewer emergency shelter options than when it declared the crisis in 2018. The city's action will result in less pubic money to provide shelter and housing for unhoused community members.

**CHICO'S POLICY AND PRACTICE OF CRIMINALIZING HOMELESSNESS**

**Chico's Laws Punishing Homelessness**

38.    In December 2020, the Chico City Council passed Ordinance 2556 to criminalize violations of the city's park regulations in Chico Municipal Code Chapter 12R.04, including camping in parks and greenways. At the December 8, 2020 Chico City Council meeting in which the city adopted Ordinance 2556, city staff and city council members said the proposed ordinance was needed to give the city the authority to criminally cite, arrest, and initiate misdemeanor charges for violations of the existing park regulations, which previously only allowed the city to administer a fine. The council passed Ordinance 2556, creating Chico Municipal Code Chapter 12.18 as an urgency ordinance on December 8, 2020. The council voted to enact Ordinance 2556,

creating Chico Municipal Code Chapter 12.18 as a regular ordinance, on December 15, 2020.

39.    Ordinance 2557 applies to thousands of acres of public property in Chico, including all of the city's parks; all city-owned greenways, adjoining all creeks, streams, and watercourses; and any property purchased by or accepted by the city for use of a park or playground.  C.M.C. § 12.04.010 and 12.18.020(N).

40.    The land subject to Ordinance 2557 represents nearly all, if not all, of the city-owned public spaces that are realistically available for people who are unsheltered to involuntarily sleep and engage in other conduct that is an unavoidable consequence their unhoused status. The City of Chico spans 27.8 square miles and Bidwell Park alone spans 5.73 square miles, more than a fifth of the city's private and public land.

41.    Chico Municipal Code Chapter 12.18 states in part:

**12.18.430 Camping - Prohibited - Exception - Permit required.**

No person or group of persons shall camp overnight or remain or stay overnight within any city park or playground unless… the overnight camping or stay is authorized by a permit…

**12.18.450 Closure of parks, greenways and open spaces.**

[I]t is unlawful for any person to be present in any city of Chico or Chico Area Parks and Recreation District parks, greenways, or open spaces during the hours the parks, greenways. or open spaces are closed. Unless otherwise posted, closing hours shall be between the hours of 11 :00 p.m. and 5:00 a.m.

42.    Chapter 12.18 does not define "camp."

43.    In addition to Ordinance 2557, the City has multiple ordinances that punish unhoused people for sleeping, sitting, lying, resting, or simply existing on public property. These ordinances are all punishable by administrative citation, infraction, or misdemeanor.

44.    **Citywide Camping Prohibition -** Chico's Municipal Codes 9.20.020 and 9.20.030 prohibits camping on all public property and states in part:

9.20.020 Definitions.

A. "Camp" means to place, pitch or occupy camp facilities; to live temporarily in a camp

8

facility or outdoors

B. "Camp facilities" include, but are not limited to, tents, huts, vehicles, recreational vehicles, or temporary shelters.

9.20.030 Unlawful camping.

[I]t is unlawful and a public nuisance for any person to camp or occupy camp facilities on any public property or any private property which is not operated and maintained as a campground…"

45.     **Storage of Personal Property in Public Places -** Chico Municipal Code 9.20.050 prohibits storage of personal property in public places and states:

It shall be unlawful for any person to store personal property, including camp facilities and camp paraphernalia, in the following areas, except as otherwise provided by resolution of the city council:

A.     Any park;

B.     Any street;

C.     Any public parking lot or public area, improved or unimproved; and

D.     On, near or adjacent to any waterway as defined in Section 9.50.020 of this code.

46.     **Sitting on Sidewalks in Commercial Districts -** Chico Municipal Code 9.44.015, which prohibits sitting on sidewalks in commercial districts, states in part:

A. Prohibition. No person shall sit or lie down upon a public sidewalk, curb or street, or upon a blanket, stool, chair or other object placed upon a public sidewalk, curb or street which is adjacent to any property zoned or used for commercial uses, . . ."

47.     **Obstructing Entrance to Buildings -** Chico Municipal Code 9.44.018 states:

No person shall stand, sit at or otherwise occupy the entrance of any building, including but not limited to a public or private building, church, hall, theater, place of public assemblage, store, or business so as in any manner to willfully or maliciously obstruct the entrance.

48.     **Congestion on Sidewalks -** Chico Municipal Code 9.44.010 states:

9

Except when authorized by a permit issued pursuant to Title 14 of this code, it shall be unlawful for any person to obstruct the free passage of traffic upon any sidewalk.

49.   **Civic Center Hours -** Chico Municipal Code 9.43.030, states in part:

B. It shall be prohibited and a violation of this section for a member of the public to access, use, be present, enter, or remain within the civic center between the hours of 10:01 p.m. and 6:59 a.m. of the succeeding day…

50.   **Waterways -** Chico Municipal Code 9.50.030, states in part:

It shall be unlawful and a violation of this chapter for any person to engage in or maintain… any of the following activities or conditions in regulated areas:

> B. Staying or camping overnight pursuant to Chapter 9.20 of this code.
>
> C. Store personal property pursuant to Section 9.20.050 of this code.

51.   **Park Regulations -** The City also has park regulations, including 12R.04.340, which states in part:

> No person or group of persons shall camp overnight or remain or stay overnight within any city park or playground unless… the overnight camping or stay is authorized by a permit… The park regulations are punishable by a fine.

### Chico Arrests, Cites, and Threatens to Arrest Unhoused Community Members Sleeping on Public Property

52.   Between 2018 and 2020, Chico public records provided by the city to Legal Services of Northern California pursuant to a public records act request show that the Defendants made 120 arrests for violations of its citywide anti-camping ordinance, Chico Municipal Code section 9.20.030. During this same time period, the city issued 21 administrative citations for violations of section 9.20.030.

53.   Chico police also have a  policy and practice of enforcing the anti-camping ordinance as well as the other ordinances that prohibit sleeping, sitting, lying, and resting on public property by warning people to move and threating citation or arrest if they refuse to move. Public records provided by the City show that between 2018 and 2020, police resolved 968 citywide calls for service based on complaints of unlawful camping with the disposition

description, "moved along".[1]

54.    For unhoused Chico community members resting or sleeping on sidewalks and other public areas, it is common to be told to move along by the Chico Police, including being woken up while sleeping and forced to move immediately. Often, officers recommended that unhoused people move to alternative locations including, other locations within parks and other public land where unhoused people have traditionally stayed.

55.    Defendants also have a policy and practice of removing people sleeping outside from locations by issuing 48-hour or 72-hour notices that inform unhoused community members they must remove their belongings and leave the location identified on the notice. These notices, titled "Illegal Encampment Notification" cite to specific sections of the city municipal code, including section 9.20.010 et seq., the citywide anti-camping ordinance, and inform the recipient "[v]iolations may result in citation or arrest."

**Chico Increased Enforcement of Its Anti-Camping Ordinances in January 2021**

56.    In early January 2021, soon after the passage of Ordinance 2556, the city and Police Deparment increased its enforcement of its anti-camping ordinances. On January 7, 2021, police issued 72-hour notices titled "Illegal Encampment Notification" to unhoused community members who were staying in areas of Bidwell Park called "Annie's Glenn" and "Horseshoe Pits." Police issued notices to approximately 50 people that day.

57.    The "Illegal Encampment Notification" cites to the Municipal Code Chapter that contains both the citywide anti-camping and property storage ordinances (CMC § 9.20.010 *et seq.*), the Park anti-camping ordinance and regulation (CMC §§ 12R.18.340, 12.18.430), the waterway ordinance (CMC § 9.50.030), and Penal Code section 647(e).  It threatens recipients that "[v]iolations may result in a citation or arrest."

58.    The Illegal Encampment Notification also states what will happen to property: "Failure to remove your property will result in removal by the City of Chico personnel. Any property that is valued over $100 and all other personal property of reasonable value will be

_____

[1] This disposition description does not include cases where people left of their own volition, because the records included a separate category, "gone on arrival".

delivered to the Police Department." The notice then provides a phone number to call to retrieve property and says property not retrieved within 90 days will be disposed of.

59.     The Illegal Encampment Notification asks "Do you need assistance complying with this order?" It instructs the recipient to contact the Chico Police Department TARGET Team at (530) 897-4942.  Upon receiving the notices in January, a number of people staying at Annie's Glenn and Horseshoe Pits, called and left messages at the phone number listed for the TARGET team. The TARGET Team did not answer the phone and did not return the messages.

60.     On January 11, 2021, the Chico Police Department arrived at Bidwell Park to enforce the notices. Unhoused community members were told they may be cited or arrested if they did not leave. Over the course of the next few days, the area was cleared of people and their belongings. Employees from the Public Works Department arrived with a back hoe and dump truck and collected as waste whatever items unhoused people could not carry with them. The city threw away tents, tarps, clothing, bedding, and other personal property.

61.     Beginning January 7, 2021, the City of Chico and Police Department issued the 72-hour notices that threaten citation and arrest to at least 100 unhoused community members in at least seven different locations. Each of these 72-hour notices cites the citywide anti-camping ordinance (Chico Municipal Code § 9.20.010 *et seq.*) and the park and greenway specific anti-camping ordinance, Chico Municipal Code § 12.18.430.

62.     When the Police TARGET Team was serving the notices, they told unhoused community members that they would have to remove their property from the encampment by the expiration of the notice and could not sleep in the park anymore after the park's closing hours. The police TARGET team said if they did not comply, they would be subject to citation and arrest, and their property would be thrown away.

63.     The officers providing and enforcing the 72-hour warning notices did not provide any information beyond what was listed in the notice itself, other than to offer bus tickets to leave Chico. The city has not provided any specific locations where unsheltered people can sleep, sit, and rest without being subject to citation or arrest. When asked where people can legally sleep in Chico when there is no shelter available, the response from the City of Chico and the police

department has been the same: people may sleep on a public right-of-way with basic necessities, a sleeping bag and pillow, but no tents or structures. The alleged acceptable place on a right-of-way is a sidewalk space that does not block entrances, driveways, pedestrian traffic, or vehicle traffic. Plaintiffs allege based on information and belief that there are no such locations in Chico sufficient for all people who are involuntarily unsheltered. Further, unhoused community members who have previously slept in locations to which they were directed by the police were later threatened with a citation or arrest if they did not leave those locations.

64.    Defendants issued and enforced the Illegal Encampment Notifications to unhoused community members on a vacant city-owned residential lot on Boucher Street, on a large grass traffic median referred to as the "Triangle," in parks, and near waterways. In other words, the city is methodically enforcing its ordinance throughout the city.

65.    Police gave at least one unhoused community member a criminal citation for a misdemeanor when he did not remove his belongings from Bidwell Park after receiving a 72-hour notice in February 2021.

66.    City leaders have made clear that the police will continue to threaten to cite and arrest and will follow through on that threat. On January 12, 2021, City of Chico Police Chief Matt Madden speaking about the Illegal Encampment Notifications stated, "As we continue to enforce this law, we hope that we continue to see compliance. If people still refuse to leave after the 72 hours and have been given the opportunity to do so, we will enforce this law with citations. This law is a misdemeanor, so physical arrest is also possible."

67.    The city's intent is to force its unhoused community members out of Chico. City Councilmember Sean Morgan stated in a radio interview on February 5, 2021:

"The police department's going to keep moving them. And they're going to keep moving them. And the stragglers that just came to Chico, which is the great majority of them, because it was convenient and it was easy, and they heard somewhere 'I can get needles and drugs, healthcare, and free camping,' they're gonna go somewhere else. And those are people that we can't help. Now is there going to be a little pain while that's happening?

Yes, and you're seeing it, and we'll stay on top of it."[2]

68.    Despite Councilmember Sean Morgan's claims, the 2019 Point In Time Survey shows that the vast majority of unhoused community members have lived in Butte County for years. More than 75 percent of people reported they lived in Butte County when they became homeless.

**PLAINTIFFS ARE UNHOUSED RESIDENTS OF CHICO AT RISK FOR CITATION OR ARREST FOR SLEEPING OUTSIDE**

**Plaintiff Bobby Warren**

69.    Plaintiff Bobby Warren has lived in Chico for about four years.  He became homeless after he and his spouse divorced and he became ill with cancer.

70.    Before becoming homeless, Mr. Warren owned a home and ran a business. Right now, he does not have any income, other than the money he earns from recycling. He was receiving unemployment insurance, but the benefits recently ended.

71.    Mr. Warren takes medication for his cancer. He uses the money he earns recycling for his medicine and must earn $60 a week to cover the costs of his medicine.  He has fatigue and low energy due to the disease and treatment. Mr. Warren also has generalized anxiety disorder and depression.

72.    Mr. Warren has slept in various places throughout Chico. During this time, he has received more than six Illegal Encampment Notifications that said he could be cited or arrested.

73.    Mr. Warren was cited in 2019 and 2020 for violating the citywide ordinance against storing personal property on public land. He was cited September 7, 2019, and fined $483 on December 10, 2019, for having personal property in a public lot or area. He was cited June 7, 2020, and fined $525 on February 2, 2021, for having personal property near a waterway.

74.    Mr. Warren was cited  and fined $483 on January 2, 2019, and cited again on March 12, 2019, for camping at or near a waterway.

75.    Mr. Warren was cited twice in 2018 for violating the Chico regulation against being in a city park after hours. He was cited February 15, 2018, and fined $516 on July 10, 2018

---

[2] https://kpay.com/podcasts/morning-show?play_file=100044

and then cited again May 2, 2018 and fined another $516.

76.    Mr. Warren's essential personal items have been taken by the police many times during his four years sleeping outside in Chico. Police have taken, among other items, his medication, food, and sleeping bag.

77.    In 2020, Mr. Warren was repeatedly told by Chico Police he could stay with his belongings in certain areas and then later told he must move from those areas.

78.    In late 2020, Chico Police told Mr. Warren he could stay at One Mile Recreation Area in Lower Bidwell Park. Chico Police then told him to go to the corner of Woodland Avenue and East Fourth Street, near Lower Bidwell Park. Chico Police told Mr. Warren he could stay there because it was not considered part of the park. However, on January 7, 2021 Mr. Warren received a 72-hour Illegal Encampment Notification for being in this area, where the police previously told him to go.

79.    The Illegal Encampment Notification stated "[v]iolations may result in citation or arrest."

80.    Mr. Warren is still sleeping outside.

81.    Mr. Warren cannot stay in a congregate shelter because he has cancer, which puts him at high risk for death or serious illness if he contracts COVID-19.

82.    Mr. Warren cannot sleep on a sidewalk or right of away because he is especially vulnerable to the elements when compared to a person who does not have disabilities. He would be very anxious about his safety due to being vulnerable to people passing by who may harm him because he is homeless on the sidewalk. It would be nearly debilitating due to his anxiety disorder.

83.    Mr. Warren is subject to arrest, citation, and prosecution because he is sleeping outdoors and has nowhere to go.

**Plaintiff Andy Lambach**

84.    Plaintiff Andy Lambach and his wife Natalie Lambach lived in Paradise, California for 6 years. On November 8, 2018 they lost their home in the Camp Fire.

85.    After the fire, Mr. Lambach and his wife came to Chico to stay at the Red Cross

shelter for fire survivors. The shelter closed in January 2019, and Mr. Lambach and his wife have been living outdoors in Chico since then.

86.     Mr. Lambach has no income and survives solely on CalFresh benefits, which provide a monthly allowance to buy food. He cannot afford to pay for housing.

87.     Mr. Lambach has congestive heart failure, an injured shoulder that only has 30 percent use, and a pinched sciatic nerve.

88.     Mr. Lambach and his wife have a dog, "Zeus".

89.     Since becoming homeless in Chico, Mr. Lambach has slept at three different locations. He has been told by the Chico police to leave locations, and has lost personal belongings that he was not able to carry away with him.

90.     In one instance, Mr. Lambach and his wife were sleeping on the south side of Comanche Creek in Chico. One day he and his wife left the area and came back to find their belongings gone. Mr. Lambach learned from other people sleeping in the area that the Chico Police had come to area and went tent to tent. If there was a tent without anyone there, the police threw that tent and the items in it away. Mr. Lambach did not receive any notice that this was going to happen and police did not leave a notice telling him how to retrieve his belongings.

91.     In August 2020, when Mr. Lambach was still sleeping on the south side of Comanche Creek, he received a 72-hour Illegal Encampment Notification. The notice told him he was at risk for citation or arrest if he did not remove his belongings from the area.

92.     When the police came to enforce the notice, the Chico police told Mr. Lambach and other unhoused residents sleeping in the area that if they did not leave and take their belongings they would be arrested and their belongings would be thrown away.

93.     A park ranger told Mr. Lambach and others sleeping in the area that they could go to the north side of Comanche Creek and would be left alone as long as they stayed at least 50 feet from the creek.

94.     However, on April 8, 2021 Mr. Lambach received a 72-hour notice threatening citation or arrest if he does not leave the area police previously directed him to.

95.     Mr. Lambach cannot sleep on a sidewalk due to the pain it will cause because of

16

his injured shoulder and pinched sciatic nerve.

96.     Due to his congestive heart failure, he is in a high risk group for becoming seriously ill if he contracts COVID-19, and is therefore at risk for serious illness or death if he were to stay at a congregate shelter.

97.     Mr. Lambach is subject to arrest, citation, and prosecution because he is sleeping outdoors and has nowhere to go.

**Plaintiff Carol Beth Thompson**

98.     Plaintiff Carol Beth Thompson has been a resident of Chico, California for 6 years. Ms. Thompson had a rent-to-own contract for a house, and then discovered the person she paid rent to was not the legal owner. She was then physically removed from the home and became homeless.

99.     Ms. Thompson has multiple physical disabilities.  She has a condition that makes it difficult to feel and close her hand, an injured hip, an injured back, and weak lungs due to a having contracted pneumonia in the past.

100.    Ms. Thompson also has depression. She has dogs to cope with her depression.

101.    Ms. Thompson has no stable source of income and cannot afford to pay for housing.

102.    When she first became homeless, Ms. Thompson moved back and forth between sleeping in the bike path between Guill Street and near the 20th Street Community Park in Chico and sleeping in the park itself. The Chico police repeatedly told Ms. Thompson she had to leave these locations.

103.    After six months of moving back and forth on 20th Street, Ms. Thompson slept at the Lindo Channel for about 2 to 3 months until the police told her that in a week they would be giving camping citations to anyone who was still in Lindo Channel. Fearing a citation, she left the Lindo Channel.

104.    Ms. Thompson then slept in One Mile Recreation Area in Bidwell Park. She would remain in one location in the park until the police would tell her to move. She would then move to another location until the police told her to move again. Eventually, Ms. Thompson

moved out of Bidwell Park due to the Chico police constantly telling her to move but not telling her where she could go.

105.    Ms. Thompson then slept at various locations in Chico. She eventually left each place because the police told her she had to remove her belongings and leave.

106.    Ms. Thompson was cited and convicted of infractions in 2017 and again in 2018 camping outside on public land. The 2017 conviction was for violating the Chico regulation against camping in a city park, while the 2018 conviction was for violating the Chico ordinance against camping near a waterway. She received a $483 fine in each case.

107.    Ms. Thompson has lost personal belongings that she could not carry away when forced to leave locations by the police.

108.    During one encounter with the Chico police, a police officer told Ms. Thompson that he is not saying that she should not be homeless, but that she should not be homeless in Chico.

109.    On August 10, 2020, when Ms. Thompson was sleeping on the south side of Comanche Creek, Officer Sandoval of the Chico Police Department told Ms. Thompson and others at the creek to move to the north side of the creek. Officer Sandoval told Ms. Thompson that she needed to move to the northside by the morning of August 12, 2020. Officer Sandoval said that if was not out by August 12, then the Chico Police Department would take care of it and take all of her belongings.

110.    On April 8, 2021 Ms. Thompson received a 72-hour notice threatening citation or arrest if she does not leave the area to which police previously directed her.

111.    The police have not told Ms. Thompson where she can legally and safely move and sleep.

112.    Ms. Thompson cannot sleep at a congregate shelter because she is at risk for becoming seriously ill from COVID-19, due to her history of contracting pneumonia.

113.    Ms. Thompson cannot sleep on a sidewalk due to her injured hip and back.

114.    Ms. Thompson is subject to arrest, citation, and prosecution because she is sleeping outdoors and has nowhere to go.

**Plaintiff Jonathon Williams**

115.    Plaintiff Jonathon Williams has been without a home in Chico for 3 years. He came to Chico to resolve some child support issues he had with the county. When he arrived he could not find affordable housing.

116.    Mr. Williams has arthritis, no vertebrae on the bottom of his spine, schizophrenia, manic depression, and bipolar disorder.

117.    Mr. Williams has a dog, "Georgia" that helps him cope with his mental disabilities.

118.    When Mr. Williams first started sleeping on the streets the police would tell him to move or they would arrest or cite him.

119.    In March or April 2020 he began to stay on the southside of Comanche Creek. During his stay there the police told him that he needed to move he would be arrested or cited. Mr. Williams moved to another area along the southside of the creek.

120.    A few months later around August 2020, the Chico Police Department gave everyone on the southside of the creek notices to vacate. They recommended that they move to the northside of the creek. Mr. Williams moved to the northside of the creek but left after about two weeks because it was so crowded there.

121.    Mr. Williams then stayed at One Mile Park until late February or early March, 2021 when the Chico Police Department gave the people staying there 72-hour notices to vacate. The police told Mr. Williams that he could move to a public space if he did not block a right of way.

122.    Mr. Williams then moved to bike path between Guill Street and the 20th Street Community Park believing this complied with the police's directions. However, the police have told him he will need to move again.

123.    Mr. Williams cannot stay in congregate housing because his mental disabilities require that he stay with his dog, and he does not know if he can bring the dog into these shelters. His disabilities also make him increasingly stressed and claustrophobic when in shelters that have strict rules and policies.

124.    Mr. Williams cannot sleep on the sidewalk due to the missing vertebrae in his lower back.

125.    Mr. Williams is subject to arrest, citation, and prosecution because he is sleeping outdoors and has nowhere to go.

**Plaintiff Michael Samuelson**

126.    Plaintiff Michael Samuelson is 62 years old and has been a resident of Chico since 1961. He last had stable housing about 8 years ago when the person he cared for as a live-in caretaker passed away.

127.    Since Mr. Samuelson lost his housing he has received citations for camping 7 times in Chico. Five of these citations were in 2013 under City of Chico municipal code section 12R.04.340. One citation was in 2018 under City of Chico municipal code section 9.20.030. One citation was in 2019 under City of Chico municipal code section 9.50.030C.

128.    Mr. Samuelson estimates that the Chico Police Department has threatened to arrest him and take his belongings approximately 20 times.

129.    In the spring of 2020, Mr. Samuelson began to sleep at One Mile Park. In January 2021 he was given a 72-hour notice to vacate. He was told that if he was not gone in 72 hours then the police would take his belongings, charge him with a misdemeanor, and arrest him. Mr. Samuelson asked where he could move and he was told any public right of way where he was not blocking access.

130.    Mr. Samuelson then moved northwest of Highway 99 in Bidwell Park. He stayed there until the police gave him another 72-hour notice on February 22, 2021. The police again told him that if he was not gone in 72 hours then they would take his belongings, charge him with a misdemeanor, and arrest him. Mr. Samuelson asked where he could move and was again told any public right of way where he was not blocking access. The police said that a bike path would be fine if he was not blocking it.

131.    Mr. Samuelson then moved to the bike path between Guill Street and the 20th Street Community Park believing this complied with the police's directions. He placed all of his belongings to the side of the path so that he would not block access.

132.   On March 22, 2021 the Chico Police Department came to the bike path and told Mr. Samuelson to expect notices to vacate soon.

133.   Mr. Samuelson cannot go into the Torres Shelter because he fears contracting COVID-19 in such a confined and populated space. He fears that, due to his age, he is more vulnerable to COVID-19 and more likely to suffer serious harm, or death, if he contracts the virus.

134.   Mr. Samuelson has tried to sleep on the sidewalk in the past but the Chico Police Department told him to move.

135.   Mr. Samuelson is subject to arrest, citation, and prosecution because he is sleeping outdoors and has nowhere to go.

**Plaintiff Tracy Miller**

136.   Plaintiff Tracy Miller is 58 years old and has been unhoused for 2 years because he is unable to afford any housing on his very limited income.

137.   Before the COVID-19 pandemic, Mr. Miller stayed in the Safe Space Winter Shelter until it closed.

138.   He then began sleeping outdoors near the Jesus Center where he received food and mail services, and then at the Triangle until February 2021 when he received a 72-hour notice that he had to leave and take his property. He complied with the notice to avoid arrest and moved to vacant, city-owned land at Boucher Street between Wisconsin Street and Little Chico Creek.

139.   At the Boucher Street location, Mr. Miller and others sleeping there were verbally harassed by neighbors and in mid-February 2021 he received a 72-hour notice that police enforced on February 16, 2021, telling Mr. Miller they would throw away any property he left behind.

140.   Mr. Miller took his belongings and went to Humboldt/Windchime Park, but again he received a 72-hour notice from the Chico Police Department to leave and take all his belongings. He left the park when police came to enforce the notices on April 1, 2021 to avoid being arrested.

141.   Mr. Miller has a dog and believes the local shelter will not allow him in with his

dog.

142.   Mr. Miller is subject to arrest, citation, and prosecution because he is sleeping outdoors and has nowhere to go.

**Plaintiff Tona Petersen**

143.   Plaintiff Tona Petersen is 55 years old and has been unhoused since she lost her home in the town of Paradise in the 2018 Camp Fire.

144.   Immediately after the Camp Fire, Ms. Petersen evacuated to Oroville with her fiancée, but due to her fiancée's violence she soon entered the Catalyst confidential shelter for domestic violence survivors where she remained until February 2019.

145.   As a result of trauma from the Camp Fire and domestic violence, Ms. Petersen has post-traumatic stress disorder, which causes panic attacks, as well as bipolar disorder and borderline personality disorder. Ms. Petersen also has a seizure disorder, a history of stroke, a heart murmur and asthma.

146.   Ms. Petersen has slept at the Comanche Creek Greenway, an open space that begins at the intersection of Park Avenue, East Park Avenue and Midway, since she left the Catalyst shelter in 2019. This location permits her to maintain distance from other people, which is essential to her controlling her mental health symptoms.

147.   Ms. Petersen is unable to live in a congregate shelter environment because close interactions with other people trigger severe symptoms related to her significant mental health conditions.

148.   Her physical disabilities prevent her from safely sleeping on a sidewalk and make her particularly susceptible to severe illness should she contract COVID-19 and she sought access to safe shelter through Project Roomkey and learned she was selected for that program, but that due to her homelessness the coordinators were unable to locate her to inform her, so she was returned to that program's waiting list.

149.   Due to very limited income from unemployment insurance and collecting cans for recycling, Ms. Petersen is unable to afford rental housing.

150.   Ms. Petersen is subject to arrest, citation, and prosecution because she is sleeping

outdoors and has nowhere to go.

**Plaintiff Christa Stevens**

151.    Plaintiff Christa Stevens has been without stable housing in Chico for 8 years.

152.    In the last 8 years Ms. Stevens has received 3 citations based on her inability to find stable housing. One of these citations was in 2018 for Unlawful Camping under City of Chico municipal code section 12R.04.340. One of these citations was 2019 for Unlawful Storage of Personal Property on Any Public Parking Lot or Public Area under City of Chico municipal code section 9.20.050C. Another citation was in 2019 for staying a park after closure under City of Chico municipal code section 12R.04.370B(4)

153.    Ms. Stevens estimates that the Chico Police Department has threatened to arrest her or give her a citation approximately 40 times in the last 8 years.

154.    Five years ago, Ms. Stevens was sleeping at Depot Park when the Chico Police Officer told her and her boyfriend that they had too many belongings. The officer took her three bags of belongings, threw them into the back of his car and said "now you gotta find new shit." She never got her belongings back.

155.    In fall 2019 Ms. Stevens began to sleep in the area of Bidwell Park northeast of Highway 99. On February 22, 2021 the Chico Police Department gave her a 72-hour notice to vacate. The police told Ms. Stevens that if she was not gone in 72 hours then the police would take her belongings, charge her with a misdemeanor, and arrest her.

156.    The police told Ms. Stevens that she could move to a public right of way where she was not blocking access. The police said a bike path would be fine if she did not block the path.

157.    Ms. Stevens then moved to the bike path between Guill Street and the 20th Street Community Park believing this complied with the police's directions.  She placed her belongings to the side of the path so that she would not be blocking people's access.

158.    On March 22, 2021 the Chico Police Department came to the bike path and told Ms. Stevens to expect notices to vacate soon.

159.    Ms. Stevens cannot stay in the Torres Shelter because she fears contracting

COVID-19 in the confined and populated space. Ms. Stevens also has a dog that helps her cope with her anxiety and makes her feel safe when outside. Ms. Stevens does not believe that she can safely bring her dog into the Torres Shelter.

160.    Ms. Stevens has tried sleeping on the sidewalk in the past and the Chico Police Department would tell her to move.

161.    Ms. Stevens is subject to arrest, citation, and prosecution because she is sleeping outdoors and has nowhere to go.

**IMMEDIATE HEALTH AND SAFETY RISKS TO UNHOUSED PERSONS FORCIBLY REMOVED FROM ENCAMPMENTS**

162.    More than 530,000 people have died of COVID-19 in the United States in the last year. More than 56,000 Californians have died of COVID-19.

163.    In April 2020, the Centers of Disease Control and Prevention (CDC) issued "Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials" (CDC Guidance on Unsheltered Homelessness).

164.    This guidance explains that "[s]ome people who are experiencing unsheltered homelessness may be at increased risk of severe illness from COVID-19 due to older age or certain underlying medical conditions, such as chronic lung disease or serious heart conditions."

165.    The CDC specifically tells local jurisdiction they should not take action to clear encampments: "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread."

166.    The CDC advises local jurisdictions to take the following actions rather than clearing encampments:

    a.    "Encourage those staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual."

    b.    "If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking

those at increased risk for severe illness to individual rooms or safe shelter."

    c.  "Work together with community coalition members to improve sanitation in encampments."

    d.  "Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day."

    e.  "If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol)."

167.    The CDC Guidance was first issued in April 2020 when the COVID-19 rates if infection were far less than they are currently in the United States, California, and Butte County.

168.    The CDC has continued to update and reaffirm its guidance, as recently as March 21, 2021.

169.    The City of Chico is not abiding by the CDC guidance. On December 8, 2020 and 15, 2020, the City Council voted to allow the city police to conducts sweeps of encampments in the city, knowing these actions violate the CDC's guidance.

170.    The city is also forcing unhoused residents to move from one location to another within the city. The city is also threatening to confiscate unhoused community members' essential items that are needed to help guard against COVID-19, such as tents.

171.    The city's ordinances, and policy and practice of banning tents, puts unhoused people at higher risk for contracting COVID-19, and increases the risks of bodily harm from exposure-related conditions like hypothermia during colder and wetter seasons and heat stroke during warmer, dryer seasons.

172.    These health risks are especially acute for people with disabilities. The 2019 Point-In-Time count found that a significant amount of Chico's unhoused community members have physical and/or mental disabilities. Around 47 percent have a chronic health disability, 15 percent have a developmental disability, 44 percent have a mental health disability, and 39 percent have a

25

physical disability.

## **LEGAL BACKGROUND**

173.    At all relevant times, Defendants and their agents acted under color of state law and within the scope of their employment.

174.    Defendants' actions and conduct have resulted and will result in irreparable injury to Plaintiffs. Plaintiffs have no plain, adequate or complete remedy at law to address the wrongs described herein. Defendants have made it clear by their previous and ongoing actions that they intend to continue the unlawful conduct described above.  Defendants have a policy and practice of  (1) confiscating and destroying the personal property of individual Plaintiffs and similarly situated homeless individuals without legal basis; and (2) criminalizing individual Plaintiffs' ability to rest and perform other unavoidable acts of survival in public places. Defendants have and will continue to participate in implementing this policy and practice unless and until restrained by an injunctive decree of this Court.

175.    The acts of Defendants as alleged above constituted violations of individual Plaintiffs' established constitutional rights. Defendants knew or should have known that their conduct in seizing and destroying individual Plaintiffs' personal property  that Defendants determined was valued as less than $100 or not of reasonable value was inconsistent with individual Plaintiffs' constitutional rights, and they knew or should have known that citing, arresting, and issuing notices threatening criminal prosecution for the Chico Municipal Ordinances discussed herein violates the Eighth Amendment.

176.    An actual controversy exists between Plaintiffs and Defendants because Defendants have engaged in the unlawful and unconstitutional conduct as alleged and intend to continue this unlawful conduct as an ongoing practice and policy of Defendants. Plaintiffs seek a declaration that the prosecution and threat of prosecution and imposition of criminal penalties for involuntary conduct associated with being homeless and the seizure and destruction of personal property without proper notices, warrants, or hearing rights is unlawful and unconstitutional.

177.    As a direct and proximate result of the Defendants' unconstitutional and unlawful policies, practices and conduct, individual Plaintiffs have suffered, and will continue to suffer

damages, including but not limited to: (1) having no place to sleep, rest, or lie without harassment and criminal punishment by Defendants; and (2) the deprivation and destruction of property, including clothing, bedding, medication, personal documents and other personal possessions, leaving them without their essential personal belongings necessary for shelter, health, wellbeing and personal dignity.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Cruel and Unusual Punishment; Excessive Fines**

**(Eighth Amendment to the U.S. Constitution; 42 U.S.C. §1983; Art. 7)**

178.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

179.    The acts and omissions of Defendants, as described herein, violate the constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment and excessive fines. By virtue of their status as homeless people, and due to the insufficiency of shelter or housing in the City of Chico, the Plaintiffs have no way to comply with the laws Defendant enacted and continues to enforce against them.

180.    The City of Chico  and City of Chico Police Department have a policy and practice of forcibly removing Plaintiffs who are involuntarily sleeping overnight from public property, including all parks, waterways, and city-owned properties. This has the effect of a citywide ban that does not allow for Plaintiffs to maintain life-sustaining activities that are the unavoidable consequence of being without housing.

181.    Defendants have a custom, policy, and/or practice of encouraging its officers to threaten and to cite or arrest homeless people for sleeping or having property in public, which is unavoidable behavior due to their unhoused status.

182.    There is an actual controversy between Plaintiffs and Defendants concerning the continued threat of citation and arrest if Plaintiffs remain on public property, in parks, waterways, and other city-owned properties. Defendants will continue enforcement throughout the city and

has a history of issuing citations and making arrests in other areas of the city. Plaintiffs desire a judicial determination of their rights and duties and a declaration as to Defendants' constitutional obligations.

## SECOND CAUSE OF ACTION

## Cruel and Unusual Punishment

## (Art. 7, §17 California Constitution)

183.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

184.    The acts and omissions of Defendants, as described herein, violate the constitutional rights of Plaintiffs to be free from actual or threatened cruel and unusual punishment and excessive fines. By virtue of their status as homeless people, and due to the insufficiency of shelter or housing in the City of Chico, the Plaintiffs have no way to comply with the laws Defendant City of Chico enacted and Defendants continue to enforce against them.

185.    Defendants have a policy and practice of forcibly removing Plaintiffs who are involuntarily sleeping overnight from public property, including all parks, waterways, and city-owned properties. This has the effect of a citywide ban that does not allow for Plaintiffs to maintain life-sustaining activities that are the unavoidable consequence of being without housing.

186.    Defendants have a custom, policy, and/or practice of encouraging its officers to threaten and to cite or arrest homeless people for sleeping or having property in public, which is unavoidable behavior due to their unhoused status.

187.    There is an actual controversy between Plaintiffs and Defendants concerning the continued threat of citation and arrest if Plaintiffs remain on public property, in parks, waterways, and other city-owned properties. Defendants have made clear that it will continue enforcement throughout the city and has a history of issuing citations and making arrests in other areas of the City. Plaintiffs desire a judicial determination of their rights and duties and a declaration as to Defendants' constitutional obligations.

## THIRD CAUSE OF ACTION

## Right to Due Process of Law: State-Created Danger

**(Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

188.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

189.    Defendants have a policy and practice of forcibly removing Plaintiffs from encampments and instructing them to sleep on rights-of-way with only a sleeping bag for protection. This places Plaintiffs in immediate danger to their health and safety by exposing them to the elements, depriving them of their rights to substantive due process guaranteed by the 14th Amendment to the U.S. Constitution.

190.    Defendants have a policy and practice of forcibly removing Plaintiffs from encampments and instructing them to sleep on rights-of-way with only a sleeping bag for protection. This places Plaintiffs in immediate danger to their health and safety from the COVID-19 global pandemic, depriving them of their rights to substantive due process guaranteed by the 14th Amendment to the United States Constitution.

**FOURTH CAUSE OF ACTION**

**Right to Due Process of Law: State-Created Danger**

**(Article I, Section 7 of the California Constitution)**

191.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

192.    Defendants have a policy and practice of forcibly removing Plaintiffs from encampments and instructing them to sleep on rights-of-way with only a sleeping bag for protection. This places Plaintiffs in immediate danger to their health and safety by exposing them to the elements, depriving them of their rights to substantive due process guaranteed by Article 1, section 7 of the California Constitution.

193.    Defendants have a policy and practice of forcibly removing Plaintiffs from encampments and instructing them to sleep on rights-of-way with only a sleeping bag for protection. This places Plaintiffs in immediate danger to their health and safety from the COVID-19 global pandemic, depriving them of their rights to substantive due process guaranteed by Article 1, section 7 of the California Constitution.

**FIFTH CAUSE OF ACTION**

**Unlawful Seizure of Property**

**(Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

194.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

195.    Defendants have a policy and practice of permanently seizing, with no opportunity for retrieval, any personal property alleged to have violated City of Chico municipal code sections 12R.04.340, 12.18.430 and 9.20.010 that is either not valued over $100 or is not "of reasonable value." This policy and practice and the property seizure that result from it are unreasonable seizures that violate the Fourth and Fourteenth Amendments of the United States Constitution.

**SIXTH CAUSE OF ACTION**

**Right to Due Process of Law**

**(Fourteenth Amendment to the U.S. Constitution; 42 U.S.C. § 1983)**

196.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set herein.

197.    The City of Chico's Anti-Camping Ordinances and, in particular, the lack of a definition of "camp" in the section 12.18.430 and the existing definitions of "camp" and "camp facilities" in section 9.20.020, create vague and uncertain requirements that are a denial of due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution, because they fail to inform Plaintiffs and other members of the public as to what speech or conduct will subject them to criminal penalties and what forms of speech or conduct will not.

**SEVENTH CAUSE OF ACTION**

**Right to Due Process of Law**

**(Article I, Section 7 of the California Constitution)**

198.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set herein.

199.    The City of Chico's Ordinance and, in particular, the definitions of "camp" and "camp facilities" in section 9.20.020, create vague and uncertain requirements that are a denial of

30

due process of law, as guaranteed by Article 1, section 7 of the California Constitution, because they fail to inform Plaintiffs and other members of the public as to what speech or conduct will subject them to criminal penalties and what forms of speech or conduct will not.

**EIGTH CAUSE OF ACTION**

**Violation of California Civil Code § 52.1**

200.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

201.    Defendants' conduct, as described herein, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise and enjoyment of Plaintiffs' rights as secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution or laws of the United States, and of the rights secured by the Constitution or laws of the State of California.

202.    Defendants have engaged in concerted and repeated conduct to cite and arrest or threaten to cite and arrest Plaintiffs under unconstitutional ordinances, on their face and as applied, and threatened to cite and arrest them repeatedly. Defendants engaged in coercive and intimidating tactics to forcibly remove Plaintiffs, present them with obviously dangerous restrictions for involuntarily sleeping outdoors, and push them out of Defendants' jurisdiction.

203.    Plaintiffs are entitled to an injunction pursuant to California Civil Code §52.1.

**EIGTH CAUSE OF ACTION**

**Declaratory Relief**

**(28 U.S.C. §§ 2201-2202)**

204.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

205.    Under 28 U.S.C. Section 2201, this Court has authority to issue a judgment declaring the rights of the parties and issue an injunction to enforce the Court's declaration.

206.    An actual controversy exists between Plaintiffs and Defendants in that Defendants have engaged in the unlawful and unconstitutional conduct as alleged and intend to continue this unlawful conduct as an ongoing practice and policy of the City of Chico and City of Chico Police

Department, whereas Plaintiffs claim that these practices are unlawful and unconstitutional and therefore seek a declaration of rights with respect to this controversy.

## **PRAYER FOR RELIEF**

207.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants City of Chico and City of Chico Police Department from enforcing the following ordinances and regulations  in a manner that unconstitutionally punishes people for involuntary sleeping on public property when there is no and inadequate available shelter: Chico Municipal Code sections 9.20.020, 9.20.050, 9.44.015, 9.44.018, 9.50.030, 12.18.430, 12.18.450, and 12R.04.340;

208.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant City of Chico and Defendant City of Chico Police Department from destroying property it values at less than $100 or determines it is not of reasonable value;

209.    For a declaration that the enjoined policies, practices, and conduct violate Plaintiffs' Constitutional rights as follows:

      a.  To be free from the seizure and destruction of personal property without proper notices, warrants, or hearing rights in violation of the Fourth and Fourteenth amendment to the U.S. Constitution.

      b.  b. To be free from cruel and unusual punishment under the 8th amendment to the U.S. Constitution for sleeping/resting/laying/camping on vacant public lots when individuals cannot otherwise obtain shelter.

210.    For statutory damages to the individual plaintiffs as provided by the Bane Civil Rights Act;

211.    For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

212.    For costs of suit;

213.    For attorney fees as provided by law;

214.    For such other relief as the Court deems just and proper.

1   Dated: April 11, 2021                     LEGAL SERVICES OF NORTHERN

2                                             CALIFORNIA

3

4                                             By:  /s/ Sarah Steinheimer

5                                             SARAH STEINHEIMER

6                                             CORY TURNER

7                                             STEPHEN GOLDBERG

8                                             Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint (*Warren, et al v. Chico*)