Roger A. Colvin, Esq. (68773)
Vincent C. Ewing, Esq. (177708)
Eric G. Salbert, Esq. (276073)
ALVAREZ-GLASMAN & COLVIN
Attorneys at Law
13181 Crossroads Parkway North, Suite 400
City of Industry, CA  91746
(562) 699-5500 · Facsimile (562) 692-2244
vewing@agclawfirm.com; rcolvin@agclawfirm.com
esalbert@agclawfirm.com

Attorneys for Defendants, CITY OF CHICO
CITY OF CHICO POLICE DEPARTMENT

**[Exempt from filing fees by Gov. Code § 6103]**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| BOBBY WARREN; ANDY LAMBACH; JONATHON WILLIAMS; MICHAEL SAMUELSON; TRACY MILLER; TONA PETERSEN; CAROL BETH THOMPSON; CHRISTA STEVENS,<br><br>　　　　Plaintiffs,<br>　vs.<br><br>CITY OF CHICO; CITY OF CHICO POLICE DEPARTMENT,<br><br>　　　　Defendants. | Case No. 2.21-cv-00640-MCE-DMC<br><br>*Assigned to Honorable Morrison C. England, Jr.*<br><br>**DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AS TO WHY SANCTIONS SHOULD NOT ISSUE** |

**TO HON. KENDALL J. NEWMAN AND TO ALL PARTIES HEREIN:**

**PLEASE TAKE NOTICE THAT** Defendants CITY OF CHICO AND CITY OF CHICO POLICE DEPARTMENT (collectively, the "City") hereby submit the following Response to Order to Show Cause as to why Sanctions Should not Issue.

///

---

1

DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AS TO WHY SANCTIONS SHOULD NOT ISSUE

1 | Dated: September 17, 2021                    **ALVAREZ-GLASMAN & COLVIN**

By: /S/ *Eric G. Salbert*
    Eric G. Salbert
    Attorneys for Defendants, CITY OF CHICO and
    CITY OF CHICO POLICE DEPARTMENT

**1. INTRODUCTION**

Plaintiffs Bobby Warren, Andy Lambach, Jonathon Williams, Michael Samuelson, Tracy Miller, Tona Petersen, Carol Beth Thompson, and Christa Stevens (collectively, "Plaintiffs") filed this action on April 8, 2021. Defendants City of Chico and the City of Chico Police Department (collectively, the "City") have been dealing with various issues regarding the homeless community since well before Plaintiffs filed their complaint. Likewise, Sean Morgan, councilmember on the Chico City Council, has been serving the City's residents of the first district since approximately 2012. Declaration of Sean Morgan ("Morgan Decl.") ¶ 1. Since that time, Mr. Morgan has generally received increasing inquiries from the public regarding the issue of homelessness to the point that he now receives multiple messages each day on the subject. Morgan Decl. ¶¶ 4-5. Prior to commencement of settlement negotiations, Mr. Morgan was able to publicly discuss the issue of homelessness without litigation-imposed restrictions. Morgan Decl. ¶ 7. Consequently, Mr. Morgan has found it to be an unusual and awkward experience having to represent his constiuents without being able to discuss an issue that has dominated local discourse. *Id*.

Mr. Morgan meant to respond to the public interest in this case when he discussed its status during the September 9, 2021 radio interview that aired on 93.9 FM KPAY, and did not mean to disrupt ongoing settlement negotiations. Morgan Decl. ¶¶ 6-8. Indeed, although he called into the radio program, Mr. Morgan was invited on that program earlier in the week. Morgan Decl. ¶ 3. He apologizes for making any comments that were not sensitive to the importance of the current settlement negotiations. Morgan Decl. ¶ 8. Now, Mr. Morgan is better equipped to traverse the dividing line between representing the public and maintaining the confidentiality with one refrain: "Negotiations are ongoing; progress is being made; please be patient." *Id*. In the context of this case, which has only increased the public's demands for information, Mr. Morgan, who has no formal legal training, made what amounts to a negligent mistake, at most, and did not intend to willfully disobey any court order. Thus, Defendants respectfully request that no monetary sanctions issue against Mr. Morgan or the City. *Morgan Hill Concerned Parents Association. v. California Department of Education*, 258 F.Supp.3d 1114, 1129-30 (E.D. Cal. 2017) ("Fed. R. Civ. P. 16(f) was added to the Federal Rules to sanction "disobedient or recalcitrant" parties and their attorneys. Fed. R. Civ. P. 16(f) advisory committee notes to 1983 amendments.

Although mere negligence is generally insufficient to warrant sanctions, court may sanction conduct amounting to "recklessness, gross negligence, repeated—although unintentional—flouting of court rules, or willful misconduct.").

## 2. ARGUMENT

### a. The Court has Broad Authority to Issue Sanctions, but Should not do so Regarding Negligent Mistakes

As explained in *Aloe Vera of America, Inc. v. U.S.*, 376 F.3d 960, 964-65 (9th Cir. 2004):

"All federal courts are vested with inherent powers enabling them to manage their cases and courtrooms effectively and to ensure obedience to their orders…. As a function of this power, courts can dismiss cases in their entirety, bar witnesses, award attorney's fees and assess fines." *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001) (citations omitted.) **Sanctions are an appropriate response to "willful disobedience of a court order … or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."** *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001) (internal quotation marks and citations omitted).

(Emphasis added.)

More recently, in *Morgan Hill*, 258 F.Supp.3d at 1129-30, this Court explained:

The Federal Rules generally encourage the court to engage in early pretrial case management to maximize judicial economy, improve trial preparation, and expedite and facilitate resolution. Fed. R. Civ. P. 16(a); *see also* Fed. R. Civ. P. 16 advisory committee notes to 2015 amendments. Specifically, Rule 16 authorizes the court to conduct mandatory pretrial conferences and issue binding scheduling orders. Fed. R. Civ. P. 16(a)-(e). To enforce the rule, the court may issue "any just orders" if a party or its attorney: (A) fails to appear at a scheduling or other pretrial conference; (B) is substantially unprepared to participate—or does not participate in good faith—in the conference; or (C) fails to obey a scheduling or other pretrial order. **Fed. R. Civ. P. 16(f) was added to the Federal Rules to sanction "disobedient or recalcitrant" parties and their attorneys. Fed. R. Civ. P. 16(f) advisory committee notes to 1983 amendments. Although mere negligence is generally insufficient to warrant sanctions, court may sanction conduct amounting to "recklessness, gross negligence, repeated—although unintentional—flouting of court rules, or willful misconduct."** *Washburn v. Morgado*, 332 Fed.Appx. 380, 383 (9th Cir. 2009) (citing *Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989)).

(Emphasis added.)

In *Aloe Vera*, 376 F.3d at 962, the Bureau of National Affairs ("BNA") pubished a 1997 article disclosing that the Internal Revenue Service ("IRS") and the National Tax Administration of Japan ("NTA") had begun auditing Aloe Vera of America and Forever Living Products Japan (collectively,

"Aloe Vera"). Aloe Vera objected to BNA's disclosure and evetually ended up entering into a settlement agreement. *Aloe Vera*, 376 F.3d at 962. In 1998, Aloe Vera sued the United States, claiming the IRS improperly disclosed tax information to the NTA. *Id*. BNA intervened, seeking a protective order prohibiting Aloe Vera from disclosing the Settlement Agreement or any of BNA's prior disclosures to the United States. *Id*. On September 28, 2001, the district court ordered Aloe Vera to enter into a confidentiality agreement with the United States so that Aloe Vera could provide BNA's disclosures to the United States, who would thereafter only be able to disclose information to counsel for the parties. *Id*. at 962-63. The September 28, 2001 order required: (1) BNA to provide a proposed protective order by October 12, 2001; (2) any party to file objections by October 19, 2001; (3) Aloe Vera to file and submit a confidentiality agreement or explain why the United States would not sign the same by October 26, 2001 and (4) for BNA to make any final objections by November 2, 2001. *Id.*

On October 12, 2001, BNA submitted a proposed protective order and Aloe Vera objected on October 19, 2001, on the basis BNA's "attorneys' eyes only" provision was too restrictive. *Id*. at 963. The United States agreed BNA's provision was too restrictive, at which point Aloe Vera removed that provision, despite the district court's order requiring the same, obtained the United States' signature, and sent the executed agreement to BNA on November 2, 2001 with a letter informing BNA that Aloe Vera would be relying on the confidentiality agreement because BNA had not provided objections by November 2, 2001. *Id*. Because Aloe Vera repeatedly tried to obtain a protective order without an "attorneys' eyes only" provision as required by the district court, the district court found its September 28, 2001 order has been repeatedly and willfully violated and issued sanctions. *Id*. at 965. The Court of Appeal affirmed. *Id*. at 965-66.

On the other end of the spectrum, the court in *Morgan Hill*, 258 F.Supp.3d at 1129, considered whether the California Department of Education ("CDE") should be sanctioned for allegedly being repeatedly unprepared and unwilling to participate in pretrial conferences and ignoring orders resulting therefrom. For example, counsel for CDE was unprepared to discuss the law on notice by publication at at least two pretrial conferences, and failed to adequately "meet and confer" before filing a discovery motion as required by the district court's order (even though it did engage in a cursory two-minute "meet and confer" phone call). *Morgan Hill*, 258 F.Supp.3d at 1130-32. Because the alleged violations

occurred in a period of approximately two-and-a-half years, the magistrate judge already ruled on many of plaintiff's claims, and plaintiff delayed in bringing its motion for sanctions by about eight months, the district court denied plaintiff's request for sanctions. *Morgan Hill*, 258 F.Supp.3d at 1130-34.

### b. Sanctions Should not Issue Because Mr. Morgan did not Intend to Disclose Confidential Settlement Information and will not do so Again

The instant matter is more closely aligned with the facts in *Morgan Hill* than those in *Aloe Vera*. Sanctions were imposed in *Aloe Vera* upon a finding that Aloe Vera knew of the court's order requiring an "attorneys' eyes only" confidentiality agreement, yet Aloe Vera nonetheless repeatedly attempted to obtain a confidentiality agreement with less stringent provisions. *Aloe Vera*, 376 F.3d at 965.  In *Morgan Hill*, the CDE was not sanctioned where its alleged improper conduct consisted of not being prepared to discuss a point of law and failing to engage in a thorough "meet and confer" telephone call, all over the course of over two-and-a-half years. *Morgan Hill*, 258 F.Supp.3d at 1130-34. Chico City Councilmember Sean Morgan's comments on one radio program do not amount to the repeated violations that occurred in *Aloe Vera*. Moreover, Mr. Morgan's comments are not as egregious as the conduct at issue in *Morgan Hill* because Mr. Morgan, as explained more fully immediately below, is not an attorney himself, was commenting on an issue that has been the subject of (until recently) unrestricted public discourse since before this litigation commenced, and has agreed not to publicly speak about this case during the course of settlement negotiations.

Mr. Morgan serves on the City of Chico City Council and has represented the people living in the City's first district since 2012. Morgan Decl. ¶ 1. However, Mr. Morgan is not an attorney and has no formal legal training. *Id.* Thus, when representatives of the Morning Show program broadcast on 93.9 FM KPAY called Mr. Morgan, on September 6, 2021, to discuss the status of this litigation and its impact on the City, Mr. Morgan accepted the invitation and called into the show on September 9, 2021. Morgan Decl. ¶ 3. It was not Mr. Morgan's intention to discuss confidential settlement information. Morgan Decl. ¶ 4.

Instead of trying to derail settlement or intentionally violate a court order, Mr. Morgan wanted to appear on the radio program to generally address this litigation considering that homelessness has been an issue of broad public interest in the City of Chico. Morgan Decl. ¶ 1. Before this litigation began,

Mr. Morgan had begun receiving communications from the public regarding homelessness in the wake of the 2018 Camp Fire, which displaced some residents of the town of Paradise to the City of Chico. Morgan Decl. ¶ 4.  Since that time, Mr. Morgan has received a growing number of public inquiries regarding homelessness, including inquiries from media outlets such as the Chico Enterprise-Record, which Mr. Morgan has observed has its own column entitled "State of Homelessness" that is dedicated to local homelessness issues.  Morgan Decl. ¶¶ 4-5.  Such inquiries have grown to the point that Mr. Morgan began receiving multiple communications per day, and the subject of homelessness became a regular point of discussion.  Morgan Decl. ¶ 5.

Mr. Morgan considered his phone call interview on the Morning Show on 93.9 FM KPAY as an opportunity to voice his opinion on a subject that his constituents have made clear they expect him to weigh in on.  Morgan Decl. ¶ 3.  Stated differently, Mr. Morgan's goal was not to breach confidentiality or upset settlement discussions, but to discuss an issue that he knows is very important to the public. Morgan Decl. ¶ 4.  This is an unusual situation for Mr. Morgan in that he was once able to discuss the issue of homelessness without having to be concerned with protecting settlement negotiations.  Morgan Decl. ¶ 7.  Consequently, it is awkward for Mr. Morgan not to speak when, for example, a media outlet wants to know why the airport resting site is being closed.  *Id*.  Many of the City of Chico's actions taken with respect to its homeless population are, literally, visible to the public, and Mr. Morgan has found it difficult not to engage with the public when people have questions about what they see happening around them.  *Id*.

This experience has highlighted for Mr. Morgan exactly how such difficult situations may be handled.  Moving forward, he understands the only acceptable refrain he may offer to anybody about this case while settlement negotiations are underway is, "Negotiations are ongoing; progress is being made; please be patient."  Morgan Decl. ¶ 8.  Again, Mr. Morgan did not mean to disrupt settlement negotiations with the statements he made on the radio on September 9, 2021, he apologizes for speaking about the settlement process, and he will not disclose any such information again.  Morgan Decl. ¶¶ 4-8.  In other words, Mr. Morgan's conduct did not amount to willful disobediance or recalcitrance warranting sanctions, but was the product of being thrust into a highly publicized case.  Because Mr. Morgan has agreed not to publicly speak about settlement negotiations, Defendants respectfully request that no

sanctions be issued against Mr. Morgan or the City.

### 3. CONCLUSION

Defendants respectfully request that monetary sanctions not issue against Mr. Morgan or the City.

Dated:  September 17, 2021                **ALVAREZ-GLASMAN & COLVIN**

By: /S/ *Eric G. Salbert*
   Eric G. Salbert
   Attorneys for Defendants, CITY OF CHICO and
   CITY OF CHICO POLICE DEPARTMENT

## DECLARATION OF SEAN MORGAN

I, Sean Morgan, hereby declare and state as follows:

1. I am over the age of 18 years. I serve on the City of Chico City Council, representing the residents of the City's first district. I have been a councilmember since approximately 2012. In addition to serving as a councilmember, I operate my own small businesses. However, I am not an attorney and I do not have any formal legal training. I state the following of my own knowledge and belief, and if called as a witness in this matter, I could and would competently testify thereto.

2. I make this declaration in response to the Court's order to show cause issued on September 10, 2021.

3. On Thursday, September 9, 2021, I called into the Morning Show program broadcast on 93.9 FM KPAY and hosted by Scott Michaels and Mike Baca. Although I called into that program, I was invited on the show by the hosts earlier in the week of September 6, 2021, to discuss the status of the litigation.

4. It was not my intention to discuss confidential settlement information over the radio on September 9, 2021. Before this case began, the issue of homelessness in the City of Chico had already been a topic of considerable public interest. When the Camp Fire destroyed the town of Paradise in 2018, the homeless population expanded as those who lost homes in Paradise moved to the City of Chico. From that point forward, I have generally received a growing number of communications from individuals and businesses wondering what action the City of Chico might take with respect to the growing homeless population.

5. Presently, I generally receive multiple communications per day on the subject of homelessness. On days the City of Chico takes any action impacting its homeless population, I receive significantly more communications. The content of the messages can generally be broken down into two ideological frameworks: (1) those who feel the homeless are negatively impacting their larger community; and (2) those who feel the larger community has not adequately cared for the homeless population. I am informed and believe that the polarization of this issue has become so great that the local newspaper known as the Chico Enterprise-Record has begun publishing a series of articles entitled "State of Homelessness."

6. With the above context in mind, I would like to note that when I was asked to call into the Morning Show on 93.9 FM KPAY, my focus was not trained on the confidentiality of the settlement negotiations as, in retrospect, it should have been. Instead, I was focused on responding to an issue that I have had to deal with as a councilmember for years, well before this litigation commenced or any rules of confidentiality impacted me. As a public servant, I want to keep the public informed, especially on issues that they contact me about every day. Stated differently, my goal was not to breach confidentiality or upset settlement discussions, but to discuss an issue that I know is very important to the public.

7. This is an unusual situation for me in that I was once able to discuss the issue of homelessness without having to be concerned with protecting settlement negotiations. Consequently, it is awkward for me not to speak when, for example, a media outlet wants to know why the airport resting site is being closed. Many of the City of Chico's actions taken with respect to its homeless population are, literally, visible to the public, and it is difficult not to engage with the public when people have questions about what they see happening around them.

8. Moving forward, I understand the only acceptable refrain I may offer to anybody about this case while settlement negotiations are underway is, "Negotiations are ongoing; progress is being made; please be patient." I did not mean to disrupt settlement negotiations with the statements I made on the radio on September 9, 2021, I apologize for disclosing any confidential settlement information, and I will not disclose any confidential information again.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of September 2021, at Chico, California.

*Sean Morgan*

DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AS TO WHY SANCTIONS SHOULD NOT ISSUE

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2021, I electronically filed the foregoing document with the Clerk of the Court for the UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/S/ *Liza Slaughter*
Liza Slaughter

4845-6476-6459, v. 2